UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DEVEN HAMMOND                                 CIVIL ACTION

VERSUS                                    NO. 17-1709-SDD-EWD

DAN DISCH, ET AL.

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

COMES NOW Plaintiff, Deven Hammond, by and through counsel, who respectfully submits this memorandum, pursuant to Local Civil Rule 7(f), in support of her Opposition to the Motion to Dismiss filed by Defendants (Rec. Doc. 14). For the reasons stated herein, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion to Dismiss.

## FACTS

Deven Hammond is a scholar-athlete who has only one kidney. After playing at Louisiana State University ("LSU") during his freshman year, he transferred to the University of Southern Mississippi ("USM") after Defendants induced him to transfer. At USM, he was cleared to compete by the Student Health Services Center and began to practice with the team. But when a coach found out he had only one kidney, they removed him from the team – even though Deven's nephrologist cleared him and he offered to sign a waiver of liability. The USM Athletic Program overrode the determinations of their own Student Health Services Center and disregarded the opinion of a nephrologist knowledgeable about Deven's medical history. USM prohibited Deven from playing football in violation of the second-opinion and waiver policies set forth in its own Sports Medicine Policies and Procedures.

Defendants seek to dismiss Deven's claims on several grounds. First, they postulate that this Court lacks personal jurisdiction over both Coach Disch and USM. Second, they challenge

1

Deven's invocation of federal subject matter jurisdiction. Finally, they assert that Deven has failed to state a claim for which relief may be granted under the Americans with Disabilities Act or the Rehabilitation Act.

## LAW AND ANALYSIS

**A.** **Mr. Hammond's Complaint Has Adequately Alleged Personal Jurisdiction Over Defendants.**

Where a nonresident defendant seeks dismissal for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the district court's exercise of personal jurisdiction over the nonresident defendant is proper. *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997). When a district court decides the issue of personal jurisdiction without conducting an evidentiary hearing, the plaintiff meets his burden on a *prima facie* showing that personal jurisdiction is proper. *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002). "'[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and **conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor** for purposes of determining whether a prima facie case for personal jurisdiction exists.'" *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (quoting *D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545-46 (5th Cir. 1985) (emphasis added).

Deven's Complaint makes an adequate prima facie showing that personal jurisdiction is proper by alleging that Coach Disch and USM purposefully directed recruitment activities toward Deven, a Louisiana resident, and this litigation results from the injuries and discrimination Deven experienced that arose out of those recruitment activities. Rec. Doc. 1, p. 9, ¶ 41. Coach Disch declares "to the best of his knowledge and belief" that Deven initiated communications with USM

regarding Deven's transfer. Rec. Doc. 14-2. That declaration, however, merely creates a question of fact which must be resolved in Deven's favor.

Even if Coach Disch's recollection is accurate and he merely responded to calls and text messages from Deven, the Defendants are nevertheless subject to specific jurisdiction in Louisiana because they were free to ignore Deven's calls and messages. By responding to Deven and inducing him to transfer from LSU to USM, the Defendants purposefully directed recruitment activities toward Deven in Louisiana.

The Fifth Circuit has established a three-step analysis to determine whether specific personal jurisdiction exists: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). Once a plaintiff establishes minimum contacts which have a sufficient nexus to his claims, the defendant then bears the burden to demonstrate that being hailed into court in the forum state would offend traditional notions of due process. *Dontos v. Vendomation NZ Ltd.*, 582 F. App'x 338, 348 (5th Cir. 2014). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S. Ct. 2174, 2184–85, 85 L. Ed. 2d 528 (1985).

Coach Disch and USM are subject to specific jurisdiction in Louisiana because their active recruitment of Deven for the USM football team constitutes a purposeful direction of activities toward Louisiana, where Deven resided at the time. There is a clear nexus between the Defendants'

contacts with Louisiana and this litigation because Deven's claims of discrimination and damages would not exist but for the fact that Coach Disch induced Deven to transfer to USM. The Defendants have not presented a compelling case to defeat jurisdiction.

**B.** **Even if This Court Lacks Personal Jurisdiction, the Proper Recourse is to Transfer the Action—Not to Dismiss the Action.**

Lack of personal jurisdiction over a defendant is an appropriate ground for a transfer of venue pursuant to 28 U.S.C. § 1406(a). *See Ellis v. Great Sw. Corp.*, 646 F.2d 1099, 1105-07 (5th Cir. 1981) (analyzing distinctions between transfer of venue under section 1404(a) and 1406(a), and finding that "a section 1404(a) transfer c[an] properly be made despite the fact that the transferor court lacked personal jurisdiction over the defendant … it remains the rule in this circuit that a transfer to a district in which personal jurisdiction over the defendant can be obtained may properly be made under either section 1404(a) or section 1406(a)."). *See also Bentz v. Recile*, 778 F.2d 1026, 1028 (5th Cir. 1985) (affirming "transfer of a removed case from a district where venue is proper, under 28 U.S.C. § 1441(a), but where personal jurisdiction is lacking, to another district where both venue is proper and personal jurisdiction can be had over the defendants.").

28 U.S.C. § 1406(a) is the appropriate vehicle for transfer of this matter, as it provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

Should this Court find that it lacks personal jurisdiction over the Defendants, Deven's claims should not be dismissed. Rather, in the interest of justice, Deven's claims should be transferred to the Southern District of Mississippi, Eastern Division, where personal jurisdiction over both Coach Disch and USM is proper, where witnesses and evidence are located, and to avoid any potential statute of limitations issues.

4

**C. Sovereign Immunity Does Not Bar Plaintiff's Claims Under Title II of the ADA Because Plaintiff's Claims Implicate Irrational Prejudice Discrimination and the Equal Protection Clause.**

Having determined "which aspects of [Mississippi's] alleged conduct violated Title II" for purposes of the *Georgia* analysis—namely, the decision by Defendants not to permit him to participate in the football team—the Court must consider "to what extent such misconduct also violated the Fourteenth Amendment." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (*quoting United States v. Georgia*, 546 U.S. 151, 159, 126 S. Ct. 877, 882, 163 L. Ed. 2d 650 (2006)) (internal quotation marks omitted). If this conduct violated both Title II and the Fourteenth Amendment, then Congress's abrogation of Mississippi's sovereign immunity is unambiguously valid in this case. *Id*. If Mississippi's conduct violated only Title II, then the question of the abrogation's validity becomes more complicated.

As was stated in *Arce v. Louisiana*, the following analysis should guide the Court in deciding whether the Congress adequately abrogated Defendant's sovereign immunity.

"Section 5 of the Fourteenth Amendment grants Congress the power "to enforce, by appropriate legislation, the provisions of" the amendment. In *Katzenbach v. Morgan*, 384 U.S. 641 (1966), the Supreme Court linked the scope of this constitutional language to Chief Justice Marshall's classic formulation of the scope of Congress's Necessary and Proper Power in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819): "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 384 U.S. at 650-51 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 421 (interpreting U.S. Const. art. I, § 8, cl. 18) and applying it to § 5) (internal quotation marks omitted). Through the lens of *McCulloch*, the *Morgan* Court viewed § 5 as "a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Id.* at 651.

Three decades later, however, the Supreme Court revised the metes and bounds of congressional authority under § 5 in *City of Boerne v. Flores*, 521 U.S. 507 (1997):

The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States.... Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. *There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.*

521 U.S. at 519-20 (emphasis added) (internal citation omitted) (alterations in original).

Worded differently, *Boerne* directs that "[t]he appropriateness of remedial measures must be considered in light of the evil presented." *Id.* at 530. What may be appropriate prophylactic legislation under § 5 with respect to one class of state conduct may be wholly unwarranted with respect to another. *Id.*

Thus, *Boerne*'s "congruence and proportionality" test—as applied to Title I of the ADA in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001)—consists of three prongs. The first prong directs a court to "identify with some precision the scope of the constitutional right at issue" in a given case, as defined by relevant case law. *Garrett*, 531 U.S. at 365. Then, "hav[ing] determined the metes and bounds of the constitutional right in question," the second prong involves considering whether Congress documented "a history and pattern" of unconstitutional action impinging on that right. *Id.* at 368. For the third prong, the court must determine whether Congress's means to prevent or remedy state incursions on the right is appropriate—*i.e.*, congruent and proportional—based on Congress's documentation. *See id.* at 372-74.

Less than a decade after introducing *Boerne*'s "congruence and proportionality" test into its Fourteenth Amendment jurisprudence, the Supreme Court applied the test to Title II in *Tennessee v. Lane*, 541 U.S. 509 (2004). In *Lane*, two "paraplegics who use wheelchairs for mobility" brought Title II claims against Tennessee, alleging that it "denied [them] access to, and the services of, the state court system by reason of their disabilities." 541 U.S. at 513. Tennessee argued that Congress had not validly abrogated state sovereign immunity under Title II. *Id.* at 514. The *Lane* Court disagreed, concluding that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533-34.

According to *Lane*, "[t]he first step of the *Boerne* inquiry [is to] identify the constitutional right or rights that Congress sought to enforce when it enacted Title II." *Id.* at 522. The *Lane* Court concluded that Congress enacted Title II to enforce the constitutional prohibition on irrational disability discrimination, as well as "to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Id.* "These rights include some, like the right of access to the courts at issue in [*Lane*], that are protected by the Due Process Clause of the Fourteenth Amendment."

Second, *Lane* considered the "historical experience" reflected by Title II. *Id.* at 523. The *Lane* Court determined that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id.* at 524. This backdrop was illustrated in part by federal and state case law, which "demonstrate[d] a pattern of unconstitutional treatment in the administration of justice." *Id.* at 525. Further, "[t]his pattern of disability discrimination persisted despite several federal and state legislative efforts to address it." *Id.* at 526.

The *Lane* Court went on to observe that, "[w]ith respect to the particular services at issue in [*Lane*], Congress learned that many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." *Id.* at 527.

6

Important for present purposes, the *Lane* Court accepted as relevant the "numerous examples" of such exclusion documented by Congress's Task Force on the Rights and Empowerment of Americans with Disabilities, including examples showing a "failure of state and local governments to provide interpretive services for the hearing impaired." *Id.* (citing Task Force on the Rights and Empowerment of Americans with Disabilities, From ADA to Empowerment (Oct. 12, 1990)).

Ultimately, *Lane* accepted Congress's finding, "set forth in the text of the ADA itself," that "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and *access to public services.*" *Id.* at 529 (quoting 42 U.S.C. 12101(a)(3)) (internal quotation marks omitted) (emphasis in original) (alteration removed). "This finding, together with the extensive record of disability discrimination that underlies it, makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." *Id.*

Third and finally, *Lane* asked "whether Title II is an appropriate response to this history and pattern of unequal treatment ... as it applies to the class of cases implicating the accessibility of judicial services." *Id.* at 530-31. The *Lane* Court answered this query in the affirmative:

> Congress' chosen remedy for the pattern of exclusion and discrimination described above, Title II's requirement of program accessibility, is congruent and proportional to its object of enforcing the right of access to the courts. The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination. Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this "difficult and intractable proble[m]' warranted 'added prophylactic measures in response."

> *22 *Id.* at 531 (quoting *Nevada Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 737 (2003)) (alteration in original).

Post-*Lane*, circuits have split as to how *Lane* impacts the case-by-case application of the *Boerne* test in the Title II context. Some circuits have read *Lane* to streamline the relevant analysis under *Boerne*'s first two prongs, leaving only the question whether Title II exhibits congruence and proportionality as it applies to the class of cases implicating the particular right at issue in a given case. *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 486-90 (4th Cir. 2005) (Shedd, J.); *Klingler v. Director, Dep't of Revenue, State of Missouri*, 455 F.3d 888, 896-97 (8th Cir. 2006) (Arnold, J.); *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957-59 (11th Cir. 2005) (Kravitch, J.); *see also McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 423-26 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in part). This interpretation of *Lane* still involves a determination as to whether the right at issue was one that Congress sought to enforce when it enacted Title II. *See, e.g.*, *Constantine*, 411 F.3d at 486-87. What it does not involve, however, is an extensive inquiry into Title II's legislative record in every case involving the validity of Title II's abrogation. *See, e.g.*, *id.* at 487.

Other circuits have read *Lane* more narrowly. These circuits have continued to require courts to proceed through each step of the *Boerne* inquiry where Congress's purported abrogation of State sovereign immunity under Title II is at issue, including a deep dive into Title II's legislative record. *See Toledo v. Sanchez*, 454 F.3d 24, 34-35 (1st Cir. 2006) (observing that "[s]ome appellate courts have chosen to interpret ... *Lane* as conclusively establishing that Title II survives the first two steps of the *City of Boerne* inquiry," but determining that "the sounder approach is to focus

the entire *City of Boerne* test on the particular category of state conduct at issue."); *Guttman v. Khalsa*, 669 F.3d 1101, 1117-18 (10th Cir. 2012) (Tymkovich, J.) (same).

    Both of these views find support in *Lane*'s language. *See Lane*, 541 U.S. at 522-34. For its part, however, the Court concludes that the former view—which most circuits to have considered the issue have adopted—offers the more sound reading of *Lane*. This reading appears to best respect *Lane*'s comprehensive analysis of Title II's constitutional concerns and supporting history. Moreover, it appears to best reconcile that analysis with its instruction to conduct a case-by-case inquiry into Title II's validity as § 5 legislation.

    Thus, a court tasked with determining whether Title II validly abrogates state sovereign immunity in a given case must first ask whether the state's action in the case implicates a constitutional right within the universe of rights identified by the *Lane* Court—namely, rights grounded in the Fourteenth Amendment's Equal Protection and Due Process Clauses. *See id.* at 522-23 (determining that Title II "seeks to enforce th[e] prohibition on irrational disability discrimination" and "other basic constitutional guarantees, infringements of which are subject to more searching judicial review"). If no, then Title II does not validly abrogate state sovereign immunity. If yes, then "the sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services" supports Congress' enactment of Title II as prophylactic legislation to enforce that right. *Id.* at 528-29. A court then need only ask whether Title II is congruent and proportional as to the class of cases implicating the right."

    No. CV 16-14003, 2017 WL 5619376, at *19–22 (E.D. La. Nov. 21, 2017).

Here, Mr. Hammond's case implicates a constitutional right within the universe of rights identified by the *Lane* Court—namely, rights grounded in the Fourteenth Amendment's Equal Protection and Due Process Clauses. *Lane*, 541 U.S. at 522-23 (determining that Title II "seeks to enforce th[e] prohibition on irrational disability discrimination" and "other basic constitutional guarantees, infringements of which are subject to more searching judicial review"). Specifically, Mr. Hammond's case implicates the Equal Protection clause.

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. Defendants are correct that "public education" and "disability discrimination"

are not "fundamental rights." *See* Rec. Doc. 14-1, pp. 14. However, Defendant ignores that neither is education "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Plyler v. Doe*, 457 U.S. 202, 221, 102 S. Ct. 2382, 2396, 72 L. Ed. 2d 786 (1982). The Supreme Court has "repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to 'sustaining our political and cultural heritage' with a fundamental role in maintaining the fabric of society." *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) (*quoting Plyler*, 457 U.S. at 221, 102 S.Ct. 2382); *see also Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954); *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954). Therefore, the Supreme Court struck down under heightened scrutiny the exclusion of a discrete group of children from a free public education offered to other resident children as violative of equal protection. *Plyler*, 457 U.S. at 230, 102 S.Ct. 2382.

Accordingly, states may treat disabled students differently or refuse to make special accommodations for the disabled so long as the states' actions are rationally related to some legitimate governmental purpose. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366–68, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). States may not, however, treat disabled students differently solely out of "irrational prejudice." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450, 105 S. Ct. 3249, 3259, 87 L. Ed. 2d 313 (1985); *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006).

Here, Mr. Hammond has alleged that he was taken "off the football team" and that Defendants revoked their offer for a full-time scholarship. *See* Rec. Doc. 1, ¶ 95. According to the Complaint, counsel for Defendants confirmed that they would only listen to one doctor—Dr. Thorton. *Id*. at ¶ 74. In fact, Defendant's overrode their own second options and waiver policies to prevent Plaintiff from playing on the team. *Id*. at ¶ 76. Defendants discriminated against Plaintiff

by reasons of his disability or by reason of USM's treatment of him as if he were disabled. *See* Rec. Doc. 1 at ¶ 87. USM discriminated against Plaintiff by denying him full access to its services, programs, or activities. *Id.* at 89. Here, Plaintiff alleges that Defendants treated him—a disabled student— differently solely because of his disability, *i.e*, "irrational prejudice." Accordingly, this case implicates a constitutional right within the universe of rights identified by the *Lane* Court— namely, rights grounded in the Fourteenth Amendment's Equal Protection clause.

### D.  Plaintiff Has Adequately Stated a Claim for Relief Under the ADA and Section 504 of the Rehabilitation Act.

In its memorandum, Defendants claim that Plaintiff fails to state a claim upon which relief can be granted under the ADA or Section 504 of the Rehabilitation Act. *See* Rec. Doc. 14-1, pp. 15-19. In support of this position, Defendants argue that Plaintiff is not an "individual with a disability" and that "playing intercollegiate football" is not a major life activity. *Id.* at 16-17. Defendant ignores the clear allegations in the Complaint and the regulations of the ADA.

Mr. Hammond alleges that "Deven Hammond is a qualified individual as that term is defined in the ADA." *Id.* at ¶ 82. Mr. Hammond further alleges that "[t]he ADA also protects persons who are regarded by a public entity as having a physical or mental impairment that substantially limits a major life activity, whether or not that person actually has an impairment." *Id.* at ¶ 83. Plaintiff even includes an illustration from the U.S. Department of Justice's ADA Technical Assistance Manual which highlights that the ADA can be violated even where they are not actually disabled. *Id.* at ¶ 84.

Here, Defendants completely ignore both Mr. Hammond allegation that he is a "qualified individual" under the ADA *and* Mr. Hammond's allegation that he qualifies under the "regarded as" prong of the ADA regulations. Defendant's failure to address these allegations leads to waiver.

In regard to Mr. Hammond's allegation that he is a "qualified individual" under the ADA, Defendant has completely failed to respond to this allegation. It is well established that "[t]he notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 551 (5th Cir.2003) (internal quotation omitted). Whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Here, Mr. Hammond has alleged that he has one kidney and that he is a "qualified individual" under the ADA. While it is true that Mr. Hammond has not included an inordinate amount of detail or precision regarding the precise nature of his disability, this Court can draw on its experience and common sense to determine that further factual development and discovery will reveal that Mr. Hammond has issues caused by his lack of a kidney.

In the alternative, Mr. Hammond's allegation that he qualifies under the "regarded as" prong of the ADA regulations. Indeed, Section § 35.108(a)(1)(iii), definition of disability, states that disability means "Being regarded as having such an impairment as described in paragraph (f) of this section." Looking at paragraph (f), it states that:

> *Is regarded as having such an impairment.* The following principles apply under the "regarded" as prong of the definition of "disability" (paragraph (a)(1)(iii) of this section):
>
> (1) Except as set forth in paragraph (f)(2) of this section, an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity, even if the public entity asserts, or may or does ultimately establish, a defense to the action prohibited by the ADA.
>
> (2) An individual is not "regarded as having such an impairment" if the public entity demonstrates that the impairment is, objectively, both "transitory" and "minor." A public entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory

11

and minor; rather, the public entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment), objectively, both "transitory" and "minor." For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title II of the ADA only when an individual proves that a public entity discriminated on the basis of disability within the meaning of title II of the ADA, 42 U.S.C. 12131–12134.

Here, Mr. Hammond further alleges that "[t]he ADA also protects persons who are regarded by a public entity as having a physical or mental impairment that substantially limits a major life activity, whether or not that person actually has an impairment." *See* Rec. Doc. 1 at ¶ 83. Plaintiff has clearly implicated Section § 35.108(a)(1)(iii), but Defendants have completely failed to address this section. Accordingly, Plaintiff has adequately stated a claim as an individual who is "regarded as" having a disability. Any attempt by Defendant to rebut this position in its Reply should be summarily rejected.[1] Indeed, Defendants clearly regarded Plaintiff has having a disability—this is precisely why Defendants kept him off the football team. Under any circumstances, Plaintiff has satisfied the "regarded as" provision of the ADA.

### E.  Plaintiff's State-Law Claims Against USM and Coach Disch Should Be Deferred.

Plaintiff is still evaluating the merits of his state-law claims against USM and Coach Dich. In his supplemental memorandum, Plaintiff will advise as to whether he is continuing to pursue his state-law claims and, if so, the legal basis for those claims.

---

[1] Any new arguments or evidence include with Defendants' reply papers is waived. *See Gold v. Wolpert*, 876 F.2d 1327, 1331 n. 6 (7th Cir.1989) ("It is well settled that new arguments cannot be made for the first time in reply. This goes for new facts too."); *Payne v. Giant Food, Inc.*, 346 F.Supp.2d 15, 21 n. 4 (D.D.C.2004) ("These facts were raised for the first time in his reply ... petitioners effort to meet his burden comes too late.") (*citing U.S. v. Wilson*, 240 F.3d 39, 45 (D.C.Cir.2001)); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 682 (S.D.Cal.1999) ("It is well accepted that raising of new issues and submission of new facts in [a] reply brief is improper.") (*citing Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996)).

12

## CONCLUSION

For the reasons set forth above, and as will be more fully set forth in the supplemental memorandum, Defendants' Motion to Dismiss should be denied.

Respectfully Submitted,

**BIZER & DEREUS, LLC**
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Jacqueline K. Hammack (LA # 34581)
jhammack@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

\*\*\*AND\*\*\*

Law Office of William Most, L.L.C.
William Most
Louisiana Bar No. 36914
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (650) 465-5023
Email: williammost@gmail.com
*Attorneys for Plaintiff*

By:      /s/ Garret S. DeReus
                Garret S. DeReus

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all parties that have appeared in this matter.

13

By:     /s/ Garret S. DeReus